HAMITER, Justice
 

 (dissenting).
 

 As is pointed out in the majority opinion, relator, Shelby M. Jackson, was discharged by the State Superintendent of Education from the position of State Supervisor of Vocational Agriculture, but subsequently he was retained in that capacity by the State Department of Education. Because of those conflicting acts, this litigation arose, presenting for determination the single issue of whether the ultimate or final authority to dismiss relator is with the State Superintendent or with the State Board. The case does not involve the question of where, as a matter of policy or principle, such authority should lie; a question of that nature unquestionably addresses itself to the consideration of the state’s law making bodies, not the judiciary.
 

 In determining the single issue presented here we must interpret, that is ascertain the will and intent of 'the Legislature in enacting, Section 3 of Act No. 100 of 1922, the pertinent part of which reads :
 

 “Section 3. The following divisions of the State Department of Education are recognized and the State Board of Education is authorized and directed to provide the necessary employees in them, the salaries and expenses of whom shall be paid out of appropriations made by the Legislature, and such other sources as may be available.
 

 “A. Division of Educational Supervision.
 

 “B. Division of Teacher Training and Certification.
 

 “C. Division of Vocational Education.
 

 “The State Superintendent of Public Education shall select the employees in the various divisions herein established. * * ijí
 
 »
 

 Relator directs attention to the provision in the first paragraph of the quoted section which recites that the “State Board of Education is authorized and directed to provide the necessary employees * * * ”; and he contends that under that provision the State Board has authority to appoint, or to approve the Superintendent’s selection of, all employees in the three recognized divisions, and, having the authority to thus provide, it .also has the ultimate power to dismiss the employees.
 

 The respondent Superintendent, on the other hand, emphasizes that portion of the section which announces that, “The State Superintendent of Public Education shall select the employees in the various divisions herein established”; and1 he insists that the Legislature intended by Section 3 o’f the Act that the State Board should provide or create the various positions of employment and, after their creation, the Superintendent should have the exclusive right of appointing, and also of dismiss
 
 *750
 
 ing, the occupant of each position so created. His contention, in other words, is that by the use of the' word “select” the Legislature intended to give him the unqualified right of hiring and firing all employees.
 

 According to Webster’s New International Dictionary, Second Edition, the verb “provide” means: To supply for use; to afford; to contribute; to furnish; to stock; to equip in preparation. The verb “select” is defined by the same authority: To take by preference from among others; to pick out; to cull. With these definitions in mind it must be admitted that Section 3 of Act No. 100 of 1922, with reference to the matter of obtaining employees for the three named divisions and their dismissal, is not free from ambiguity; it is confusing to say the least. This being true, it' becomes necessary, in order to ascertain the legislative will and intent in the enactment of Section 3, to enlist the aid of well recognized rules of statutory construction, some of those applicable here being:
 

 “Where the words of a law are dubious, their meaning may be sought by examining the context with which the ambiguous words, phrases and sentences may be compared, in order to ascertain their true meaning.” Civil Code Article 16.
 

 “ * * * However, in interpreting a part or section of an act, in dispute, the part or section should be interpreted in connection with the rest of the . act, and in connection with all laws on the' same subject-matter. Moreover, .the object that the Legislature had in view should be ascertained, and the interpretation adopted which best harmonizes with the context and with that object. * * *” Thibaut v. Board of Commissioners of Lafourche Basin Levee District, 153 La. 501, 96 So. 47, 48. (Quoted with approval in Bradley v. Swift & Co., 167 La. 249, 119 So. 37.)
 

 Before applying those rules of construction, however, it is appropriate to consider briefly the historical background of the legislation in question. The ; Constitution of 1913 contained only two articles dealing specifically with the State Superintendent of Education and the State Board of Education. Article 249 provided:
 

 “There shall be elected by the qualified electors of the State .a Superintendent of Public Education, who shall hold his office for the term of four years, and until his successor is qualified. His duties shall be prescribed by law, and he shall receive an annual salary of Five Thousand Dollars, payable monthly, on his warrant.”
 

 And Article 250, insofar as pertinent, i ecited:
 

 “The General Assembly shall provide for the creation of a State Board, and Parish Boards of Public Education. * *
 

 Pursuant to those articles (as well as others on the subject of public education) in the 1913 Constitution, the Legislature in 1916 enacted Act No. 120 of that year, being “An Act in relation to free pub-lip schools and to regulate public education in the State of Louisiana; * * The first section of that Act created the State Board, it reciting:
 

 
 *752
 
 “ * * * That there shall be a State Board of Education of six members, five appointed at large by the Governor and not subject to removal by the Governor, The Governor, in providing for the first State Board of Education under this Act, shall appoint one member for a term of five years, one for four years, one for three years, one for two years, and one for one year. The sixth member shall be the State Superintendent of Public Education. After the first Board all members of the State Board of Education shall be appointed for terms of five years. * * * The Governor shall fill by appointment all vacancies on the Board.”
 

 Section 20 of said Act No. 120 of 1916 made provision for the payment of the salary of the State Superintendent and of his office expenses, and then said:
 

 ‘ * * * He shall have authority to appoint clerks and porters as may be necessary and prescribe their duties, * *
 

 Continuing, said Section 20 stated:
 

 “ * * * The State Board of Education shall have authority to appoint such assistant superintendents and supervisors and inspectors, or special lecturers and instructors, as may be needed for the proper prosecution of public education, and to fix the salaries and expense for such work, which shall be paid out of appropriations made by the General Assembly out of the school funds. * * *”
 

 By the Constitution of 1921, it will be noticed, material and drastic changes were effected in the educational system that existed under the 1913 Constitution and under Act No. 120 of 1916. Showing some of those changes are the following provisions of Article 12 of the 1921 Constitution, quoted just as originally adopted:
 

 “Section 1. The educational system of the State shall consist of all free public schools, and all institutions of learning, supported in whole or in part by appropriation of public funds. * * * ”
 

 “Section 4. There is hereby created a State Board of Education to be composed as follows: three members to be appointed by the Governor for terms of four years, ore each from districts co-extensive with the present Railroad Commission districts, and eight to be elected for terms of eight years, except as herein provided, from districts ' corresponding to the present Congressional districts. The Legislature shall provide fpr the organization of said board so that two of the elected members shall be chosen at each Congressional election. The first board shall be elected in 1922 and begin office the second Monday in January, 1923, and the term of two of whom shall expire in two, four, six and eight years respectively.
 

 “The members appointed by the Governor shall be persons experienced in aducational matters, and all members shall serve without pay, except such per diem and traveling expenses as shall be fixed by the Legislature.
 

 “The Legislature shall prescribe the duties of 1 said board and define its powers ; provided, that said board shall not control the business affairs of parish school boards, nor .the selection or removal of their officers and directors.
 

 
 *754
 
 “Section 5. The board shall elect for terms of four (4) years a chairman and a State Superintendent of Public Education. The latter shall be ex-officio secretary, and his salary shall be fixed by the board at not less than five thousand ($5,000.00) dollars nor more than seven thousand five hundred dollars ($7,500.00) per annum, payable monthly on his own warrant, and he may be removed by the board.
 

 “Section 6. The State Board of Education shall have supervision and control ■of all free public schools.
 

 “Section 7. The Legislature shall create a governing body for the Louisiana State University and Agricultural and Mechanical College, composed of members appointed by the Governor by and with the advice and consent of the Senate, with overlapping terms; of which the Governor shall be a member and ex-officio president. The State Board of Education shall have visitorial powers over said institution.
 

 “The State Board of Education shall have supervision of all other higher educational institutions, subject to such laws as the Legislature may enact.- It shall appoint such governing bodies as may be provided. It shall submit to the Legislature, or other agency designated by the Legislature, a budget for said Board and for these institutions.
 

 “It shall prescribe the qualifications, and provide for the certification of the teachers of elementary, secondary, trade, normal and collegiate schools; it shall have authority to approve private schools and colleges, whose sustained curriculum is of a grade equal of that prescribed for similar public schools and educational institutions of the State; and the certificates or degrees issued by such private schools or institutions so approved shall carry the same privileges as those issued by the State schools and institutions.
 

 “Section 8. It shall not create or maintain any administrative department in which salaries or expenses are payable from State funds, unless authorized by the Legislature. The Legislature shall prescribe the terms under which funds offered for educational purposes shall be received and disbursed.”
 

 When the Legislature met in regular session in 1922 there was in force and effect the Constitution of 1921 in its original form, including all of the above quoted provisions. To make operative the system of public education as outlined in such Constitution, that body enacted Act No. 100 of 1922, including the disputed Section 3. The entire title of the Act reads:
 

 “To provide a State Board of Education and Parish school boards, defining their duties and powers, and providing for the administration and supervision of the public schools of Louisiana.”
 

 Section 1 deals with the organization of the State Board as created by the Constitution. Section 2 reads in part:
 

 “ *
 
 * *
 
 The Board shall elect a State Superintendent of Public Education for a term of four years and fix Ms
 
 salary, the same not to be less than $5,000.00 a year nor more than $7,500.00 a. year.
 
 The State
 
 
 *756
 

 Superintendent of Public Education shall be Secretary of the Board. Any vacancy in the office of State Superintendent of Public Education by death, resignation or otherwise shall be filled by the Board.
 
 * *
 
 *»
 
 (Italics ours)
 

 Next is the controversial Section 3, above quoted. Section 6 provides in part:
 

 “The State Board of Education shall administer the affairs of the following State educational institutions:
 

 “Louisiana State Normal College,. Natchitoches.
 

 “Louisiana Polytechnic Institution, Rustan.
 

 “Southwestern Louisiana Institute of Liberal and Technical Learning, Lafayette.
 

 “State School for the Deaf, Baton Rouge.
 

 “State School for the Blind, Baton Rouge.
 

 “Southern University, Scotlandville.
 

 “State School for Blind Negroes, Scotlandville.
 

 “State School for Dea,f Negroes, (not yet located).
 

 “In its management and control of these institutions, it shall have authority to appoint an executive committee of two in addition to the State Superintendent of Public Education who shall be ex-officio a member and chairman, for each institution, the members of which shall not be required to be members of the State Board of Education. The executive committees provided for in this section shall perform such duties as may be required of them by the State Board of Education.- * iji *
 

 And Section 34 of the 1922 Act states:
 

 “It shall be the duty of the State Superintendent of Public Education to keep in close touch with all of the state educational institutions under the control of the' State Board of Education, and of all the public schools of the various parishes of the State with the view of seeing that the physical plants of the schools are adequate and kept in the proper state of repair and sanitation; that the courses of study prescribed by the State Board of Education are faithfully followed; that teachers meet the standards prescribed by the State Board of Education; that classes are not overcrowded; that children are properly classified as to grades; that wise methods are used in the presentation of the subject matter; and in all other ways possible to assist the local authorities, superintendents, and teachers to secure the best possible results from their efforts. In the prosecution of this work of inspection and supervision, the various employees in the State Department of Education shall be under the immediate direction and control of the State Superintendent of Public Education, and they shall make such verbal and written reports to him as he may require. In the professional administration of the schools, as indicated in this section, it shall be the duty of the heads of the various state educational institutions and.of the public school officials in the various parishes to be guided, as far as practicable, by the suggestions and di
 
 *758
 
 rections of the State Superintendent of Public Education. The traveling and other necessary expenses of the State Superintendent of Public Education and other employees of the State Department of Education while engaged upon their official duties shall be paid out of the State Current School Fund not to exceed amounts appropriated by the Legislature for this purpose.”
 

 Several months after the effective date -of Act No. 100 of 1922, specifically on November 7, 1922, there was adopted by the electorate of the state a proposed amendment to Section 5 of Article 12 of the 1921 Constitution, reading:
 

 “There shall be elected by the people at each succeeding general election a State 'Superintendent of Public Education, who shall be ex-officio Secretary of the Board, •and whose salary shall be fixed by the State Board of Education at no less than Five Thousand ($5,000.00) Dollars, nor more than Seven Thousand Five Hundred ($7,500.00) Dollars, payable monthly on his own warrant.”
 

 This amendment gave the State Superintendent no powers. It changed the Constitution, as well as Act No. 100 of 1922, only to the extent of providing that the Superintendent shall be elected by the people instead of by the State Board. In all other respects the mentioned constitutional provision and statute as originally adopted remained in effect.
 

 Now to interpret the confusing and controversial Section 3 of Act No. 100 of 1922, with a view of determining the issue respecting relator’s dismissal, the disputed portions of that section reading: “The State Board of Education is authorized and directed to provide the necessary employees * * * ” and, “the State Superintendent of Public Education shall select the employees * * It will be remembered that, according to the well recognized rules of statutory construction, the section is to be construed in connection with the other provisions of the Act and with all laws on the same subject matter. Moreover, the object that the Legislature had in view is' to be ascertained, and the interpretation to be adopted is that which best harmonizes with the context and with such object.
 

 First tp be noticed is the fact that the. title to Act No. 100 of 1922 in no manner mentions the State Superintendent, his duties or his privileges. The reason for this is obvious. The Act was passed and became effective according to the provisions of Article 12, Section 5 of the 1921 Constitution as it was originally written, when the Superintendent was elected by the State Board and, hence, was merely an employee of it, holding his position at its pleasure. That he was nothing more than the Board’s employee is made manifest by various provisions of that statute. For example Section 2, quoted supra, specifically provided for the Board’s election of the Superintendent, just as the Constitution did, and further provided for its filling any vacancies in that position resulting from death, resignation or otherwise. Again, Section 34 of the' Act speaks of the “State Superintendent of Public Educa
 
 *760
 
 tion and other employees of the State Department of Education.”
 

 Of course, in the body of Act No. 100 of 1922 (but not in its title) the State Superintendent is required to perform various duties in the furtherance of the system of public education. But the statute clearly shows that he is to perform those duties in an executive or managerial capacity and under the supervision, direction and control of the State Board, all in keeping with the constitutional mandate (Sections 6 and 7, of Article 12) that the Board shall have supervision and control of all free public schools, and also supervision, subject to such laws as the Legislature may enact, of all higher educational institutions except Louisiana State University. For instance, Section 6 of the Act charges the State Board with the duty of administering the affairs of eight of the higher educational institutions, and then states
 
 "In its management and control of these
 
 institutions, it shall have authority to appoint an executive committee of two in addition to the State Superintendent of Public Education who shall be ex-officio a member and chairman, for each institution, the members of which shall not be required to be members of the State Board of Education." Section 6 further recites that each of those executive committees, of which the -Superintendent is a member and chairman, shall perform such duties as may be required by the State Board.
 

 With further reference to the Superintendent’s executive and managerial duties under the Act of 1922, Section 34 thereof requires him to perform certain acts of inspection and supervision in connection with “all of the state educational institutions under the control of the State Board of Education, and of all the public schools-of the various parishes * * (The public schools are placed under the Board’s control by the Constitution.) Then Section 34 continues: “In the prosecution of this work of inspection and supervision, the various employees in the State Department of Education shall be under the
 
 immediate
 
 direction and control of the State Superintendent * * The connotation of this last quoted provision is-that the employees are under the
 
 immediate or first
 
 control and direction of the Superintendent in the prosecution of the named work, but they are under the
 
 ultimate
 
 or
 
 filial
 
 control and direction of the Board.
 

 Further evidence of the Legislature’s intention, as well as of its respect for the constitutional mandate, that our public school system shall be under the complete control of the State Board of Education is found in the statutes which established the various trade schools of Louisiana. In each statute it is specifically provided that “The State Board of Education shall administer the affairs' of said institution.”' See Act No. 215 of 1934 (Sullivan Memorial Trades School); Act No. 265 of 1936 (Shreveport Trades School) ; Act No. 14 of 1938 (Huey P. Long Memorial Trades School of Winnfield, Louisiana); Act No. 15 of 1938 (T. H. Harris Trades. School of Opelousas, Louisiana) ; Act No. 25 of 1938 (Southwest Louisiana Trades. School); Act No. 62 of 1938 (Southwest
 
 *762
 
 Louisiana Trades School of Lake Charles, Louisiana); Act No. 309 of 1938 (Thibodaux Trades School) ; Act No. 314 of 1938 (St. Bernard Parish Agricultural and Trades High School); Act No. 315 of 1938 (Alexandria Trades School and Lafayette' Trades School); Act No. 53 of 1940 (New Iberia Trades School and Natchitoches Trades School); Act No. 109 of 1942 (Avoyelles Parish Trades School); Act No. 234 of 1942 (Florida Parishes Trades School of Hammond, Louisiana); Act No. 30 of 1944 (Ouachita Valley Vocational School).; Act No. 263 of 1944 (Baton Rouge Trades School).
 

 It is significant also that when the.constitutional convention of 1921 gave specific control and supervision of public education to the State Board (such was not given by previous Constitutions), it failed to direct the Legislature to prescribe the duties of the State Superintendent as had been done by the constitutional convention of 1913.
 

 Considering then that both the Constitution of 1921 and Act No. 100 of 1922, which was passed pursuant to that Constitution, made the Superintendent merely an employee of the State Board, removable at its pleasure, and ga,ve to the latter control and supervision of the public school system, the conclusion is inescapable that the ultimate or final authority for obtaining and discharging employees in the Department of Education (other than those specifically excepted by the Constitution or protected by the Civil Service and Teachers Tenure Laws, to which categories this relator does not belong) rests with the State Board of Education. From this it follows that by Section 3 of Act No. 100 of 1922 the Legislature intended that the right of employing (providing) the employees of the three named divisions is with the State Board, although the Superintendent has the authority of selecting, choosing or picking out, from among those available or who might apply, the persons to be so employed. Having the right to employ (provide), the Board necessarily has the right also of disapproving the dismissal or discharge of an employee.
 

 Appropriate to the matter of the coríect interpretation of Section 3 of Act .No. 100 of 1922, and expressive of my view, L the following interesting comment found in the brief of the attorneys who are appearing herein as Amicus Curia;:
 

 “The duty of the Superintendent to select does not carry the power to discharge.
 

 “First, as has been pointed out, the providing by the Board is the essential act that brings into existence the hiring or employing/ From which it follows that only the Board can discharge.
 

 “Second, Section 3 requires two acts, one by the Superintendent and one by the Board, to make an employee in one of the divisions. The act of selecting by the Superintendent cannot carry the right to discharge.
 

 “Where a statute in providing for the employees in certain parts of a system of public education provides that one authority shall provide the necessary employees therein and that another authority shall select the employees therein, neither au
 
 *764
 
 thority has the full right to finally appoint such employees, without the required action of the other authority. In other words, it appears that the action of each authority when authorized complies with the law and makes the appointment complete. The selection of the selecting authority of an employee is not by itself a compliance with the law and is not the exclusive title of the employee to the office. It is necessary that the other authority provide the employees which implies the determination of what employees are needed and the determination of the standards and qualifications, and the fixing of a salary which the person will accept. The language of the statute is not ‘provide for’ but ‘provide.’ If a person selected fits the requirements and accepts the salary, i. e., if he is provided, then such person becomes the chosen and appointed employee. If, in the opinion of the providing authority, such person does not fit the requirements, it would appear that the obligation to provide is broader than the obligation of selecting, which means taking one out of a number or any number that might be available. Therefore, if the providing authority considered the person selected not one whom it should provide, it would ha,ve the veto power — particularly where that authority is vested with the constitutional power of supervision and control over the system of public education.
 

 “It would appear that where the selecting power has selected an employee and the other power has provided that employee and that employee is performing his functions, the selecting power would not have the authority by himself to discharge such employee. Commonly the power that appoints an employee can also discharge him. Where the selecting power discharges an employee, he is not exercising the authority of selection given by the statute, the only one given him, and it would appear that 'he has exhausted that authority so far as that particular employee is concerned and that, therefore, such employee could only be discharged or removed either by the other authority or at least by the concurrence of the two authorities.
 

 “Third, there is another reason. Suppose an employee becomes or proves to be incompetent or' unfit or unsuitable or a mere political appendage, and the Superintendent won’t consent to his removal, then the Board has the power and the duty to discharge him under its power of supervision and control and under its obligation to the people to manage and administer the public schools in the interest of the best possible results. This accords with the reason, spirit and object of the Constitution and the legislation.
 

 “Furthermore, it is admitted that only the Board can fix the positions to be manned. It finds that one has become a fifth wheel, that one is no longer needed, that one group overlaps another, that inefficiency prevails, so the Board abolishes or consolidates. When it does so necessarily it discharges one or many, and the duty of the Superintendent to select has no bearing.”
 

 From a, practical standpoint the State Superintendent, under the Constitution and
 
 *766
 
 the statute in question, manages the public school system of Louisiana subject to the supervision and control of the State Board of Education, just as the general manager of a large corporation manages the affairs of the corporation subject to the control and supervision of a Board of Directors. Since each of those boards meets only occasionally, of necessity it can not handle the multitudinous details of operations that arise nor select the numerous employees required. Consequently, the manager attends to those matters, and his acts with respect thereto a,re valid and binding when they are expressly approved or when no objection is registered by the board. But having control and supervision over the entity and its manager, the board has the power and authority to prevent, whenever it sees fit, the occurrence of any of the manager’s acts.
 

 Of no importance to this case is the fact that after the effective date of Act No. 100 of 1922 the State Superintendent was required to be chosen by the people, not by the State Board. As pointed out above, the amendment which provided that change affected the 1921 Constitution and the Act of 1922 .in no other manner; it granted the Superintendent no power whatsoever.
 

 It is a general rule that where a statute is susceptible of two constructions, one of which malees it unconstitutional and the other constitutional, the interpretation making it constitutional must be adopted. To interpret Section 3 of Act No. 100 of 1922 (conceded to be ambiguous) as giving the State Superintendent the unqualified or exclusive right to hire and fire is, in my opinion, to render that legislation unconstitutional. Hence, such an interpretation should not be adopted.
 

 As before shown the constitutional convention of 1921 created the State Board of Education and then directed the Legislature to prescribe its duties and define its powers. Section 4 of Article 12. At the same time, however, that convention granted specific powers to the Board and withheld others from it, with reference to which, obviously, the Legislature is without right to effect any change or alteration. Among the powers denied the Board were (1) the right to control the business affairs of parish school boards or to select or remove their officers and directors (Section 4 of Article 12), and (2) the right to create or maintain any administrative department in which salaries or expenses are payable from state funds, unless authorized by the Legislature (Section 8, Article 12). Among the specific powers granted to the State Board (which can in no manner be lessened or otherwise altered by the Legislature) is the one that is set forth alone in Section 6, Article 12, quoted supra and as follows: “The State Board of Education shall have supervision and control of all free public schools.”
 

 The supervision and control of all free public schools thus conferred upon the Board is in no manner qualified, restricted or limited, except by the mentioned specific limitations. Had the convention intended to place some general limitation on that power it would have done so by adding
 
 *768
 
 thereto, as it did with other provisions, a clause such as “subject to such laws as the Legislature may enact.”
 

 Now what is meant by the words “supervision” and “control”? Webster’s New International Dictionary, Second Edition, gives the following definitions: Supervise —to oversee for direction; to superintend; to inspect with authority. Supervision— act or occupation of supervising; inspection; oversight. Control (noun) — the act or fact of controlling; power or authority to control; directing or restraining domination. (Synonyms — regulation, direction, management). Control (verb) — to exercise restraining or directing influence over; to dominate; to regulate. . (Synonyms) — restrain, rule, govern, guide, dilect, check, subdue). Thus “supervision” deals with authoritative inspection, oversight and direction; “control” is both directing and restraining domination, and deals with management and regulation.
 

 The word “supervision” was under consideration in the case of State ex rel. Dodd v. Tison, 175 La. 235, 143 So. 59, 60. Therein an expelled student of the Louisiana State Normal College sought a writ of mandamus against its president to compel reinstatement. In sustaining exceptions of no cause of action and nul tiel corporation and rejecting relator’s demands, this court referred to various provisions of Act No. 100 of 1922 (the statute involved in this case), as well as to Article 12, Section 7 of the Constitution of 1921, which provides that “The State Board of Education shall have supervision of all other higher educational institutions, subject to such laws as the Legislature may enact”; and it made the following observations, among others, viz.:
 

 “From the above provisions it is clear that the administration of the affairs of the Louisiana State Normal College, is vested in the state board of education, which has full and complete power, including matters of discipline.
 

 >¡1 ‡ ifi >[*
 

 “Since the normal college itself has no legal status, it follows that its president is likewise incapable of standing in judgment in matters pertaining to it. The governing body being the state board of education, suits involving its administration of other educational institutions must necessarily be brought against the state board.
 

 “As the entire power of administration of the Louisiana State Normal College is vested in the state board of education, a student who complains of the action of the agents or employees of the state board, in matters of discipline, must exhaust his recourse before the proper school authorities, as a condition precedent to a resort to the courts.”
 

 The court in the Dodd case recognized the paramount power of the State Board in the administration of the affairs of the higher educational institutions, the recognition being primarily because of the “supervision” granted it by the Constitution. The power granted the State Board with reference to public schools generally, and applicable to the instant case, is both “supervision and control.”
 

 
 *770
 
 With the supervision and control of public education, therefore, being constitutionally vested in the State Board, certainly Section 3 of Act No. 100 of 1922 should not and must not be construed as giving to the State Superintendent (to whom the Constitution grants no powers) the unqualified and uncontrolled right of appointing and discharging the employees of the three divisions named therein. Such an interpretation would make the provisions in question violative of the Constitution, null and void, a situation which clearly was not intended by the Legislature.
 

 In the majority opinion it is said that to hold that the Superintendent does not have exclusive authority in naming and discharging all employees is to make him a mere figurehead. Considering the multitudinous duties assigned to him by the statute, clearly he is not a figurehead. He is the secretary of the Board and general manager of the Department of Education, responsible for the direction of operational details and for the carrying into effect of all formulated policies; subject, however, to the authority of the State Board. If the Superintendent is now a mere figurehead simply because he does not have the uncontrolled right to hire and fire all employees, he likewise enjoyed that appellation while serving under the provisions of Act No. 120 of 1916, at which time he was elected by the people of the state whereas the members of the State Board were appointed by the Governor. According to Section 20 of that statute, above quoted, the Superintendent had, authority to appoint only clerks and porters; the State Board had authority to appoint “such assistant superintendents and supervisors and inspectors, or special lecturers and instructors, as may be' needed for the proper prosecution of public education
 

 The argument that Section 34 of the Act of 1922 clothes the Superintendent with authority to control the employees, and hence gives him the right to appoint and discharge them at will, overlooks entirely the word “immediate” which precedes the words “direction and control.” As above shown, the phrase “immediate direction and control” presupposes an “ultimate direction and control,” which in my opinion is with the State Board.
 

 The majority opinion emphasizes that portion of Section 4, Article 12 of the Constitution which provides that, “The Legislature shall prescribe the duties of said board and define its powers,” and treats the provision as a constitutional limitation of the Board’s authority. I cannot agree to such an interpretation. As pointed out above, the only limitations to the provision of Section 6 of Article 12 of the Constitution that “The State Board of Education shall have supervision and control of all free public schools” are those' specifically set forth in the Constitution,1 one of which limitations ds that the Board shall not control the business affairs of parish school boards nor the selection or removal of their officers and directors. The mentioned emphasized provision only means that the Legislature is directed to
 
 *772
 
 enact legislation detailing the various duties and powers embraced in the “supervision and control,” as specifically limited, granted to the State Board by the Constitution.
 

 The fact that for a period of 23 years the right of the State Superintendent to select, employ, or discharge those who serve under him has not been challenged is unimportant .and beside the point. It may well be assumed that no such challenge was made for the reason that no disagreement arose on the subject between the State Superintendent and the State Board, the former’s actions having met with the complete approval of the latter, or because the Superintendent, when conflicts occurred, always recognized the paramount authority of the State Board, which is constitutionally vested with supervision and control of all free public schools and is composed of eleven members, eight of whom are elected by the people from the respective congressional districts and serve overlapping terms and three of whom are persons experienced in educational matters and are appointed by the Governor.
 

 Therefore, in my opinion, the action of the State Board of Education in retaining relator, .Shelby M. Jackson, had the effect of overruling or nullifying the dismissal order issued to him by the State Superintendent, and he is still the regularly employed State Supervisor of Vocational Agriculture in the Division of Vocational Education, entitled .as such to be paid the salary sought herein.
 

 For these reasons I respectfully dissent.